on behalf of the colleagues, Mr. Robert A. Fredrickson, on behalf of the athletics, Julie A. Tischer. Thank you. Mr. Fredrickson, you may proceed. Thank you. Good morning. This case basically involves two issues, one that is purely a question of law and one that's purely fact-driven. The question of law centers on the fact that this was a product liability case alleging that there was poor design in a Stanley door and also that there was a component failure and then similar allegations based on negligence. The product itself, the door system itself, was 13 years old at the time of the accident. So the product liability statute of repose barred the action. But in the process of the court ruling that the action was barred, the court ruled that the failure of a component that was less than 40 years old was also barred. And as where the court went wrong, in my opinion, is the statute provides that if you replace a component, that doesn't restart the statute of repose on a design deficiency. But did they find that the replacement was replaced due to a design deficiency? Did anybody testify to that? It was replaced because it failed. Because it failed, but did it fail due to a design deficiency or did it fail because it was old, it was broken? Did your expert testify that it failed because it was a design deficiency? The allegations in the complaint was that it failed and in the facts that it failed in the close contact position and that it was an inferior switch in as much as it failed. Four years into the switch wouldn't be many repetitions. Did your expert in a deposition indicate that it failed because there was a design deficiency? I don't believe so. I think he testified that it failed because it was a poorly manufactured switch and had a short life. Short life is kind of speculative, isn't it? Isn't that kind of the conclusion? No, I don't think so. A couple of reasons. Number one is this thing was three and a half years old and the only time it would be actuated is when a patron attempted to exit an entrance door. And then the breakout switch would be actuated. That's a pretty common... And how many times has that occurred? That occurs weekly. Ten times a week? Once a week? A hundred times a week? The technician said it's a common occurrence. It's certainly reasonably foreseeable misuse. And I guess my estimate would be weekly is what I think they said. But here's the point on it. The motion detector and the presence detector switches are actuated thousands of times a day. Every time somebody goes in and out of there, those are actuated. Those didn't fail. Now, this particular breakout switch had failed before the accident. It was replaced about three and a half years before the accident and was replaced about, I think, about three months after the accident. And I guess it would be like if I bought a General Motors car and it had tires manufactured by General Motors or if it had tires manufactured by Firestone. But in either event, those tires were 50,000 mile tires and they failed in the first 2,000 miles. I'd have a claim against Firestone for sure. The fact that the manufacturer happened to also be the manufacturer and distributor of the component part doesn't change the fact that they would be responsible in strict liability for a defective component part. Because of defective manufacturing? Because of defective manufacturing. Who would testify that this was manufactured defectively? They testified that we didn't have the switch. Right. But they testified that these switches prematurely failed, that they were inferior in quality, they didn't have a long life. Compared to what? I mean, who testified to the normal life expectancy of this switch? Where's that in the record? I think the testimony was that the switch should have had a long life and it didn't. And I guess what I'm answering your question is, the proof that it had a short life is not only based on the expert's testimony, but it's based on the fact that the actual application here, this same switch had failed in infinitely less repetitions than other switches on this door system. Before and after the accident. So your position is in light of the fact that it failed, that it must have been defective. Don't you have to show that the switch was in an unreasonably dangerous condition when it left Stanwin's hands before it was placed on that door in order to succeed in strict liability? And I do understand the question, and the answer is, if I buy a set of tires and they're warranted for 50,000 miles and they fail the first 2,000 miles, and I don't have the tires, then that's still proof that the tire was not properly manufactured. It depends on how it fails. I mean, we have the Sanchez case that talked about tires. Right. That talked about, you know, the experts came in and said, you know, we believe that the tire blew because it was installed improperly, and there was no evidence of that in the record. They didn't have the tire there, just like this case. So my question to you is, where's the – I mean, you know, you can't just say – I think that's what the trial court was getting at when it was talking about race hipster. This isn't a case where you can just say, it failed, we win. You have to say, it failed, here's why. It was defectively either manufactured or it was defectively designed. And I don't – I mean, I've looked at the record. I thought your expert was saying it was defectively designed based upon this arcing of the switch. I didn't see anything about a defective manufacture other than, I guess, your argument that it failed. Well, okay, it failed. It could have been some kid put bubble gum in it. I mean, who knows why it failed? Okay. Let me transition just a second into the fact-based argument and then really back to this one. Because you did mention that Judge Prochaska, his concern was, he said, you've got a circumstantial case here. So as a result, you're going to basically have to show prima facie why this system was negligently designed. Now, this is the second part of the appeal. And you've got to eliminate alternate pauses for it. It's almost like a reciprocation. You've got to show that it failed and there's no other explanation. Okay. So it's how we did that is we had the videotape of the accident. So we knew the door was broken out. We had the two automatic entrances, door technicians that were Stanley certified, that have Stanley's biggest distributor. The only people that ever worked on this door before or after the accident, they installed the original door and they installed the breakout switch when it was replaced there, before the accident, after the accident. And they said, and basically the hypothetical was, look at this videotape. Could that door system have failed, absent of failure in the breakout system? And they testified, no, it couldn't. Okay. So to me, that's a prima facie case. Did it fail? But, again, are you talking now about the negligence claim? Yes, yes, yes. Okay. No, I'm talking negligence. Okay. And so then Judge Prochaska said, well, the defense has alleged that its own distributor didn't know what they were doing and they must have miscalibrated the breakout switch, and that's an alternate explanation. So you haven't eliminated that. I don't think I have to eliminate that. But the thing that flabbergasted me was the two technicians testified, they were the only guys that worked on this thing, and it was properly calibrated when they installed it in the first place, it was properly calibrated when they put the replacement in before this accident, when they came in. After they actually replaced it, they didn't have to recalibrate it, they just had to put a new switch in there. So there's no question that that circuit failed. It failed in a completed circuit mode, which created this accident. And the reason it created this accident, when you break out the door, that switch is to dump the power on the motion activation system. And it didn't. That's when she got the door. We know that. The question is this. It failed. Let's say that you've made a case out that she pushed it out more than negative 5 degrees, the switch did not work as it was supposed to work, it failed. You've proven it failed. Is that the end of it? Is that all you have to show? No. I think I have to prove that in that circumstance, it allowed this occurrence to happen due to negligent design, that there should have been something in the system. So when a component fails, it doesn't fail in, for example, the on or the position that would jeopardize the safety of the person it's intended to protect. So to answer your question, when the breakout system failed and it failed in the on position, and we know that for positive because we can see it in the videotape, we're saying that's not an acceptable failure mode because that puts the person in jeopardy. So there are various things that were available in 1998 when this thing was manufactured and designed that would have prevented this type of failure where the door was broken out, but it didn't dump the power off the motor. Where I think, and I've tried to rationalize why I didn't do a better job of explaining it to the judge, but I think it's where everybody gets a little caught up is you come in the door and the motion sensor opens the door. That worked fine. You get through the door and the present sensor is supposed to not allow the door to open a second time if somebody's right on your trail so it would knock you down. That may or may not have worked properly, and there's an explanation for that, but that's not the allegation here. The allegation here is on that third system, the breakout, when she came out the five degrees in the wrong direction, the motion sensor did its job. It picked up motion. It opened the door. The present sensor allowed the door to open, but it should not have been able to open because the breakout circuit should have dumped all the power off the motion detection. So it shouldn't have opened automatically. It should not have opened automatically, and manually she's pushing it the other way, and it has to have that breakout feature because if you get a fire or something, people are just going to be trying to get the heck out of the place, and they've got to be able to break it out the wrong way manually. Otherwise, you'd have a pileup of people at the door trying to get out in an emergency situation. Your expert opined that the reason this happened was because of this arcing of the switch that kept it in the closed position, correct? Yes. That was his explanation on why the switch failed in the opposition. Well, let me ask you this. Let's assume that we were to hold that that opinion was based on speculation. I know you disagree with that, but let's just assume for a minute that we were to hold that that opinion is based on speculation. Is it enough simply that the switch didn't work? I mean, have you made a prima facie case for negligent design simply because it didn't work as it was supposed to operate? Or do you have to show why it didn't work? I don't think I have to show why it didn't work. So why isn't this a reciprocity case then? Because it happened, therefore there is negligence. It's a circumstantial case, and if the court wants to say it should be like a reciprocity case in that because you don't have the switch, you've got to explain why this happened, and there's no reasonable alternative explanation. Okay? I think when you prove your prima facie case that even if you, your question, even if that switch failed, you know, what's built in that system to prevent the catastrophe of that door opening and then flipping the customer, there should be some redundancy. There should be something because it's elementary to design. You don't want something to fail in the position where it's going to jeopardize the very safety that you've designed to eliminate. But do you need some independent evidence with respect to that theory above and beyond your prima facie case or to meet your prima facie case? Okay. Okay. And that's where I come back to. The people, the technical people that install the services for stamping say it couldn't have happened unless the circuit did not operate properly. Okay. That might have been from a failed switch. It might have been from something else. Okay. So Judge Prochaska says, well, you've got to eliminate the something else. Stanley comes in and says the something else could be their own factory trained technicians that installed thousands of these doors and services door, didn't know what they were doing, and they miscalibrated it. And I'm saying, wow, you know? They saved themselves from strict liability by saying that. Excuse me? Stanley saved themselves from the strict liability count by saying that. Well, no, he saved himself from the strict liability count, at least on the design issues by the statute of repose. But here's the thing. Here's the thing that I think totally eliminates that argument. They say it was miscalibrated. I pointed out in the testimony of the only two people that ever worked on the door, installation, replacement of the switch before, replacement of the switch after, they all say it was calibrated properly. Isn't that evidence that rebuts their so-called res ipsum, alternate explanation for how this accident happened? But wasn't there any paperwork indicating that they recalibrated it? No. There wasn't. No. Not that I know of. No. Because I looked carefully on that because I thought maybe the judge was confused on how the present system worked. So in the motion reconsider, I made sure that I emphasized, and I had brought it up initially, that the thing was properly calibrated. But I didn't think that was necessary to defeat the motion for assembly judgment. I didn't think I had to defeat a defense position factually claiming how they thought the accident happened that would exonerate them. But it came up that way anyway. Maybe it's the trial court. The law, as it actually is, I don't know if the trial court misspoke or what, but the law, as it actually is, is if your case is based on circumstantial evidence, you have to show the probability was what you're saying it was. It was probable that what happened is what you're saying, not just possible. That's what the case law says. Maybe the judge was saying, hey, you know, you've got these other things that could have happened. You're not telling me that it was probable that it was a defective design based upon this arcing. It's possible it could have been this, this, and this. I understand your argument is that you've eliminated all those other possibilities, but the court also did find, I believe, that the opinion was speculative based upon the testimony in the record, did it not? I think so, but I can't understand that because the expert said in the design, let's just boil it down to maybe one issue, okay? Let's say the switch failed, and the expert says, if you've got a switch that's not extremely dependable, you've got to have a redundancy in your circuit so you don't get a failure mode in the on position. And he said that's paramount to the design. That's his opinion, okay? Then the defense comes in and says, well, you know, there's an alternate explanation for this factually, and the only alternate explanation they gave was that their own people didn't know how to calibrate it or miscalibrate it. So if we just assume that's the only other explanation, but that's an explanation that would rebut my expert's opinion that you needed redundancy in the example I'm giving, we had the people that calibrated it that were standing trained that said, no, we didn't miscalibrate it. It was calibrated right when we put it in. It was calibrated right when we placed it before the accident. And when we replaced it after the accident, it was still calibrated right. So. Did you settle with, no, you didn't settle with them. No, I settled with Pharma Fleet. Pharma Fleet. Yeah, that's the owner of the store. And then I non-suited the distributor. AEW. And I didn't, I think it's in the record, I didn't settle with the distributor because I didn't think they did anything wrong. So I just non-suited them out. But your question is perfect, but what I'm frustrated about is, I got the prima facie case that it was more probable than not that it was a bad design. That fits the facts of the videotape. That fits the circumstantial facts of the case. Fine. Okay. I think I'm home and entitled to a trial on those facts. But what was really frustrating is when the defense comes in with an alternate explanation. That if we assume what's correct. We've been over that. What I'm going to do is I'm going to cut you off there because we're way past your time. And we will give you the opportunity for rebuttal argument, Mr. Frederickson. Okay. Thank you. Thank you, Your Honor. Mrs. Tesher? Tesher. Thank you. You may proceed. Good morning. Good morning. My name is Julie Tesher and I'm here on behalf of Stanley this morning. There were two bases for the trial court's order of summary judgment on the strict liability counts. The first was the statute of repose and the second was the trial court's determination that plaintiff had failed to prove that this switch was unreasonably dangerous. Absolutely no evidence that it was unreasonably dangerous at the time that it left Stanley's hands. Plaintiff didn't challenge that finding on appeal. There's nothing in plaintiff's brief challenging the trial court's determination that this switch was not unreasonably dangerous when it left Stanley's hands. Which would take care of the manufacturing claim as opposed to the design claim? The strict liability claim. The strict liability claim. That's right. The strict liability only goes to design. Yes. Manufacturing is still open. Yes. Okay. I can argue the statute of repose with respect to the strict liability count if I need to, but I think on either one of those bases the trial court was more than justified in entering summary judgment on Stanley's behalf. With respect to the negligence counts, we've spent a lot of time talking about the proximate cause end of the negligence action. We've skipped right over, plaintiff's counsel has, duty and breach of duty. There is no testimony in this record that establishes a standard for the design and manufacture of breakout switches. There's simply nothing here. Plaintiff's expert, one expert, Mr. Davis, never set a standard, never said these are how breakout switches are supposed to be designed, these are how they're supposed to work. Is there any testimony as to the normal life expectancy? None. How about redundancy, the need for redundancy in the switch? None. In terms of what it could be, how it would function. In fact, Mr. Davis testified, I don't know what the life expectancy for a Stanley breakout switch is. He said that in his deposition. He never set a standard to say a switch should last for five years, for 10 years, for 15 years. And what we know here, the undisputed facts are that this door was installed by May of 1996. The first service on this particular door at the Farm and Fleet was 10 years later, in 2006. A breakout switch was replaced at that time. So we have this door in place for 10 years. Does this case boil down to a single opinion by Davis that the switch are closed? Yes. For which there is no evidence. Well, I thought Rago testified that, I mean, he alluded to it. I mean, he said that it's almost like sitting around trying to come up with a hypothesis as to why something may have happened. But he did bring it up, and then it seemed like Davis kind of latched onto it. That's exactly what happened. Mr. Rago raised it as an obscure possibility in the first session of his deposition. Mr. Davis latched onto it. We then were brought into the case, and we get to take Mr. Rago's deposition. And we asked him, have you ever seen this? No. Have you ever heard of this? No. How would you know that this happened? The only way you would know is if you took that switch out of the box, opened it up, and looked. We have three AEW employees, Bechtel, Walt, and Rago, with a combined about 65 years of experience installing Stanley doors. None of them have ever heard of this happening. None of them have ever seen this. Their testimony was unanimously, when these breakout switches fail, they fail in the open position, and the automatic function of the door stops working. Did anyone testify that there would be physical evidence of that if they had examined it? Yes. So there would be some burn mark or blackened? Yes. Okay, thank you. The other thing that has to go along with Mr. Davis' opinion is he has to say that, okay, there was burn, it welded shut, but we know the door was working minutes after Mrs. Kurtz was taken away from the scene. So then he said, well, then, sometimes they spontaneously might un-weld. I mean, it just shows the ridiculousness of the opinion. But you have the video, too. Doesn't that cause, and in the video, it was saying that the door was open more than five degrees. Is that not enough for a prion of fascia case? No. Why not? Number one, the video does not establish the distance to which that door was opened. Dr. Davis testified to that at his deposition. He said, I can't tell from the video alone because of the angle, the distance, whatever, how many degrees that door was open. But didn't Walt testify that it was more than five degrees? I don't believe so. I don't remember that in the testimony. I thought he looked at the video. I don't remember. And even if the door was open more than five degrees, that doesn't make it a negligent design. It doesn't make it a negligent manufacture. If this door, in its 13th year, if the breakout switch didn't operate at that point, Mr. Davis hasn't testified, well, that's 13 years later, that's a design in the manufacture in defect. Plus, we have the alternative explanations. She may not have pushed it to five degrees. Maybe. But isn't that an issue for the charter of fact, whether or not she pushed the door further than the five degrees? I think that's speculative. If Davis, after reviewing the videotape, who's examined these doors for years and years and years, says, I can't say, I can't tell the degrees on that, how can we entrust a jury to say that? Mrs. Kurtz, who pushed the door, said, I can't tell you how many degrees. And I don't want to overplay that because, frankly, it doesn't matter. That still doesn't get us past the duty and breach of duty phase on the negligence action. That's all proximate cause. What exactly caused this accident? It seems like the trial court got caught up a little bit in your alternative explanations as to the presence sensor, motion sensor, and lack of five degrees. And then kind of looked to the plaintiff and said, hey, you haven't rebutted these, which isn't necessarily correct, that the plaintiff has to rebut those things if they're questions of fact. So, I mean, was the trial court's ruling correct in telling the plaintiff you had to rebut these things? I think what the trial court was also telling plaintiff was, you're trying to put up a circumstantial evidence case here, but all you're giving me are possibilities and speculation. When you put on a circumstantial case, as Your Honor has said, you have to prove a reasonable probability that this is the way it happened. And again, we're still talking only about the proximate cause element of this cause of action. We still need somebody to establish that there was a duty breached here, that there was a standard out there for breakout switches that Stanley didn't comply with, and that it could have been manufactured in an alternative manner. That the life expectancy of this switch was less than the standard in the industry. We don't have any of that. Are you micromanaging duty, though? Isn't there a duty when you put a door in that it's not going to break somebody's hip? Yes. Don't you have a duty to the public? We do have a duty. We do have a duty. What I'm saying, I'm not saying we don't have a duty. I didn't articulate that well. What I'm saying is somebody has to establish what that duty is, what's the standard. Nobody has said that, including Mr. Davis. Nobody has said these doors should last this long, this breakout switch should function in these circumstances. This is an alternative feasible design that was available in the industry, which is what we had in not the Sanchez case, but the second case we cited. This case is no different than Sanchez. Plaintiff wants to say, I was injured, there must be something wrong with this product, but that's not the way it works. There has to be a standard that the defendant didn't comply with that results in the injury. We have nothing like that in this case. All we have is an expert who admits to never having tested the door, never having tested any part of the door, never seeing the door, having no information as to the life expectancy of a Stanley switch, saying, I think this switch welded in the closed position. There's no evidence of that anywhere. It's conceded nobody's ever seen this switch after it was taken out of the door. That's a penultimate speculative opinion that starts with an injury and backs up. And that's not good enough in a negligence case. You have to show a standard that the defendant failed to comply with. You're only supposed to judge the evidence in the light most favorable to the plaintiff at this stage. There is no evidence in favor of the plaintiff. The only thing we've got is Mr. Davis's bold conclusion that these contacts welded together. And then, by the way, they miraculously unwelded minutes after the accident because the door was working properly after she was taken away in an ambulance. There is no evidence. This isn't a matter of weighing evidence. There is no evidence in the record with proper foundation. And his conclusions aren't enough to raise a question of fact on a motion for summary judgment if there's no facts to support the conclusion. He's guessing. His opinions have changed throughout the course of this case, and he's never done anything but guessed. We have Glenn Rago saying, you know, these contacts, excuse me, these cams can come out of calibration over the course of time. That doesn't mean that they were installed improperly, that they miscalibrated it. Glenn Rago testified, these cams can come out of calibration. This store was supposed to have this door on a maintenance schedule. Mr. Davis was initially very critical of the Farm and Fleet, and that's probably what caused the settlement in this case. He said, Farm and Fleet is supposed to place these doors on a maintenance program. Which brings us to paragraph or subparagraph D, the breakout switch system is unsafe due to no testing procedures. Did Stanley have a duty to advise their customers when, how often they should have them inspected and serviced and all that? Mr. Davis, in his testimony, said that the maintenance obligation flows as between AEW, who actually purchases the door from Stanley and then sells it to Farm and Fleet, and Farm and Fleet. Because AEW, they are the technicians that perform that service. And Dr. Davis testified at his deposition that he was critical of AEW and Farm and Fleet for not having that on a regular maintenance schedule. So Stanley had no obligation? We have no relationship with Farm and Fleet. Stanley does have recommended procedures for testing certain aspects of these doors, but not- I don't know that that is anywhere in this record, Justice Burke. I don't believe it is. And again- But Stanley never argued that they had no duty to do that. To do what? To advise the customers of potential safety concerns. Mr. Davis testified at his deposition that we did not. It's never been an issue. But that was a duty as between the technicians who sold the door to Farm and Fleet and the people who provided the service. So Stanley had no obligation to Farm and Fleet to tell them these breakouts would just need to be tested every so often? There is absolutely no testimony in the record that Stanley had that obligation. There's no expert who said that. There's no witness who said that. So what I'm suggesting to the Court is we can talk a lot about the alternate reasons of how this accident could have happened. But in the end, we still have to come back to the fact that there has been no standard set by this expert. There's been no testimony that there was a breach. We have explanations for this accident that don't implicate Stanley in any way whatsoever, including the fact that this cam could have come out of calibration over the years without the negligence of anyone, including the AEW technicians, and that this door was simply not maintained, that years and years had passed since the date this door was installed at Farm and Fleet until the time of this occurrence. Thirteen years had passed. So both on the strict liability counts and the negligence counts, plaintiff has fallen far short of his burden of proof at the summary judgment stage. The trial court was correct in entering summary judgment as to both the strict liability and the negligence counts. The motion to reconsider, if I need to address that, that's subject to an abusive discretion standard. Plaintiff hasn't even claimed that the trial court abused its discretion in denying plaintiff's motion to reconsider. Unless there are other points that the court would like me to address, I would just ask that this court affirm the trial court's orders. Thank you. Mr. Fredrickson, your final argument. One thing that came up in that argument was raised by a very good question, and it was about what does Stanley tell people to do about testing, and that was one of the allegations that they really never specified a test for the breakout system. They do have a system. They do have a specified test for an employee to stand inside the door and somebody to approach it and see if the door opens to check the presence-sensing system, but they have never specified how do you check the breakout switch to see if it was working. You know, they've alleged, well, the thing was working all the time. Well, you don't know. If you don't break the door out, you don't know if it's dumping the power to the inside to open the door. There's no test. It's hard even for the technicians because they have to push it out and feel the resistance when certain things happen. So Stanley has no test. So nobody checked that door afterwards until they came when the switch failed in the open position, and then it dumped all the power and the door wouldn't work. So they had to get a service call on that. But does Stanley have an independent duty as the manufacturer to advise farm and fleet of potential safety concerns? And, hey, you better check this every so often. I think so. I mean, they have it on the presence sensor, and that's less of a hazard than if this thing malfunctions. If you've got a product that has a specific danger and you can't reasonably design that out, or even that you could reasonably design that out, you should tell a consumer. You better check to make sure your wheels on the car are tight on them every so often. My question is where is that duty? Did any expert testify to that duty? Did any witness testify? Yeah, Davis testified that that was one of the deficiencies in Stanley's design, that they didn't test it. But, you know, here's kind of where I'm at. Let's assume that this kind of gets back to this prima facie case and rebuttal. First of all, I feel we made the prima facie case circumstantially. But even given that, the only explanation that Stanley gave for how this accident could have occurred that would exonerate them was it was miscalibrated by their own technicians, and their own technicians said we didn't do that. So, to me, that gives me at least an opportunity for a jury to decide, you know, which set of facts is correct. We keep getting back to what they said may have happened. The issue is whether you have pled enough, you know, to overcome. You have the burden of proving your case. You have the burden of making a case here. I mean, no matter what they say, whether their technicians say anything. And what I'm hearing from you is that the switch failed, and I presented evidence that it failed, and it injured this person. And then you have the expert's opinion about this welding of the switches. Those are the things that I'm hearing. Okay, let me take it back and stuff that. That's a good point. Okay. I have conclusively proven by videotape that the breakout system, the circuit, the switch, what happened, did not dump the power on that door. Because when you saw it broke out and you see it coming back. So right there we know it failed. Right. Okay. It failed. Okay. Now, if it's a manufacturing failure, then I've got to go farther and show, you know, why did that particular component fail? And that's what I alleged on the component switch. But on the design itself is what I'm saying is if you design something that's going to fail and put a person in jeopardy, you either got to warn about it, you've got to have instructions, or you've got to design around it. And I'm saying elementary design around it. Just put some redundancy in there so you don't have to. Well, did your expert testify to redundancy? I think so. Yeah. Well, counsel said he did. Huh? Counsel said he did. Well, they've said a lot of things. They say it's not in the evidence. I mean, they've even made allegations that contradict the videotape. Let me ask you this as one of my last questions. Okay. Couldn't AEW recalibrate it incorrectly? Why is the recalibration not necessarily a problem by Stanley as opposed to AEW who recalibrated it? They calibrated it correctly. How do you know? Because the people that did it testified that it was calibrated right when they installed it, and they tested it to be sure it was calibrated right. But there was not even any on the receipt. It never showed that they recalibrated it. If it's set right, it's a little arm. And if it's set right, they don't have to recalibrate it. You just got to get it set right in the first place. Because that little arm tells you when the door is out a certain distance, and that activates the switch. So here's the evidence on it. They calibrated it, and they did test the breakout system when they installed the door initially. And their testing confirmed that they had it calibrated correctly. They did the same thing in 2006 when they replaced the switch, and it fails at the time of this accident. And then three months later, they put a new switch in. Now, I think the point I should make is they did not have to recalibrate it on any of those subsequent occasions after the first installation because it was already calibrated right. In other words, they confirmed that it was not miscalibrated. So that takes, at least factually, that creates a factual question. And for Stanley to rest their alternative explanation, and the only explanation of how this thing, this occurrence could have happened absent a design deficiency that allowed this breakout switch to fail in that position, is to argue their position that their own technicians, when they say they recalibrated it right the first time and it was recalibrated the subsequent two times, are either lying or incompetent. I mean, you just, you know, I understand what the questions are, but I think the design was bad. I mean, if you design a wheel on a car that's only got one lug nut, and that lug nut fails and the wheel falls off, that's a pretty lousy design. That's probably why they put six of them on there. So if you get one or two, it doesn't, if it's going to create a disaster, like a wheel falling off a car at 70 miles an hour, you put six lug nuts on that thing. If a breakout switch is going to cause a disaster, because it's going to open the door right back in and the person is trying to get out, for whatever reason, whether it's a fire or an emergency or they're confused, you've got to design something in there because the consequences are so bad of that circuit failing that it's just elementary design. And the one thing that comes up here is of the things that fail on that door, none of those switches other than the breakout switch, you know, and in that first 10 years, the breakout switch at most would have an actuation, let's say, a couple times a week if somebody went out the wrong door, as opposed to all the other switches combined that would have millions of repetitions and they never fell. Thank you, counsel. Thank you to the attorneys. We'd like to thank the attorneys for their audience today, and the case will be taken under advisement. We're adjourned.